# STATE OF CONNECTICUT *v.* CARLTON WALLACE
## (SC 17759)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued September 3, 2008—officially released February 3, 2009

*John C. Drapp III*, special public defender, with whom was *Joseph A. Jaumann*, special public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Eugene Calistro*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Carlton Wallace, appeals[1] from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree

---

[1] This is a direct appeal pursuant to General Statutes § 51-199 (b) (3).

with a firearm in violation of General Statutes § 53a-55a (a)[2] and carrying a pistol without a permit in violation of General Statutes § 29-35 (a),[3] and, after a trial to the court, of criminal possession of a firearm in violation of General Statutes § 53a-217 (a).[4] On appeal, the defendant claims that the trial court improperly: (1) denied his motion to suppress a tape-recorded statement that he made to police after waiving his *Miranda* rights;[5] and (2) failed to recharge the jury on the application of the reasonable doubt standard to the defendant's

[2] General Statutes § 53a-55a (a) provides: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

[3] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28. . . ."

[4] General Statutes § 53a-217 (a) provides: "A person is guilty of criminal possession of a firearm or electronic defense weapon when such person possesses a firearm or electronic defense weapon and (1) has been convicted of a felony, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b-120, (3) knows that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice and an opportunity to be heard has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b-15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (4) knows that such person is subject to a firearms seizure order issued pursuant to subsection (d) of section 29-38c after notice and an opportunity to be heard has been provided to such person, or (5) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922 (g) (4). For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

claim of self-defense after the jury sent the trial court a note asking to be reinstructed on the definition of reasonable doubt.[6] We affirm the judgment of the trial court.

The record reveals the following facts and procedural history that are relevant to this appeal. On April 8, 2005, the victim, Dwayne Massey, was shot in the head while he was walking with his cousin, Michael Santana, on Dover Street in New Haven. The defendant was charged with murder in violation of General Statutes § 53a-54a (a),[7] carrying a pistol without a permit in violation of § 29-35 (a), and criminal possession of a firearm in violation of § 53a-217 (a). Prior to trial, the defendant moved to suppress a tape-recorded statement that he had made to detectives from the city of New Haven while he was detained in South Carolina. In that statement, the defendant admitted to shooting the victim. The trial court denied the motion. Following a jury trial, the defendant was acquitted of the charge of murder but was found guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm in violation of § 53a-55a. The jury also found the defendant guilty of carrying a pistol without a per-

---

[6] At oral argument in this court, the defendant waived his third claim, in which he alleged that the trial court improperly had delivered an unduly coercive antideadlock jury instruction in violation of the defendant's right to due process.

[7] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

mit.[8] The trial court sentenced the defendant to a total effective sentence of thirty-five years imprisonment, execution suspended after twenty-five years, and probation for a term of five years. This appeal followed.

I

The defendant first claims that the trial court improperly denied his motion to suppress his tape-recorded statement. On appeal, the defendant argues that, because South Carolina does not afford the right to counsel during extradition proceedings,[9] the defendant cannot have knowingly and intelligently waived his right to counsel with reference to the Connecticut criminal charges in this action. We disagree.

The record reveals the following additional facts that are relevant to our resolution of this claim. Subsequent to the issuance of an arrest warrant for the defendant, Detective Andrew Muro of the New Haven police department notified the United States Marshals Service that the defendant was "in the Carolinas . . . ." Acting upon information from the New Haven police department, Deputy United States Marshal Stewart Cottingham, Jr., filed an application and affidavit for a search

---

[8] With respect to the charge of possession of a firearm, the defendant elected to be tried by the court, which found him guilty of that offense.

[9] At the hearing on the motion to suppress, the trial court found that "[i]t is the practice in South Carolina that fugitives do not go before a judge. The person handling the booking makes a notation regarding a waiver of extradition and . . . [a] court liaison officer is advised that the detainee needs to be spoken to regarding a waiver of extradition. If the fugitive waives extradition, he is held for a maximum of [twenty-one] days to be picked up by the demanding state. He is not brought to court or before a magistrate during that time. If the fugitive refuses to waive extradition, a warrant would be obtained, he would be brought before a magistrate, then to the state capitol for an extradition hearing. Other than the waiver of extradition form itself, there is no other form advising the fugitive as to his rights regarding extradition. The public defender will not represent a fugitive at this stage of the proceedings. Fugitives are told that they are—by waiving extradition, they will be returned more quickly to the demanding state than if they oppose extradition."

warrant in the United States District Court for the District of South Carolina for an address located at 615 Simmons Street, Florence, South Carolina. On May 18, 2005, Cottingham executed the warrant, whereupon the defendant was arrested and taken to the Florence County detention center. On May 19, 2005, the defendant waived extradition to Connecticut.

On that same day, New Haven Detectives Martin Dadio and Michael Quinn (detectives), met with the defendant in South Carolina to investigate the homicide. In a tape-recorded statement, the defendant admitted to the shooting. As part of that statement, the defendant also claimed that the shooting was in response to an incident in which the defendant alleged that Santana and the victim had been part of a group that had fired shots at him and others one or two weeks earlier. When the defendant's group and the victim's group recognized each other, the defendant asked for, and received a gun from a nearby friend, and then fired shots at the victim and his associates. The defendant claimed that the shooting was in self-defense.

On March 3, 2006, the trial court held a hearing to address the defendant's motion to suppress his tape-recorded statement. At that hearing, the detectives each testified as follows. The defendant, subsequent to his arrest in South Carolina, notified authorities in that jurisdiction that he wished to speak with New Haven police. Thereafter, the detectives flew to South Carolina, where they met privately with the defendant at police headquarters in Florence County. The detectives introduced themselves and announced the purpose of their visit. The defendant appeared interested and eager to talk to them. During that interview, the defendant was not handcuffed and neither detective was armed. The detectives read the defendant his *Miranda* rights from a standard waiver form, and the defendant signed the form indicating that he waived those rights. When

the defendant signed the waiver, his demeanor was calm, and there were no signs that the defendant was under the influence of alcohol, narcotics, or any other substances. At no time during the interview was the defendant deprived of any food or water, nor was he denied any requests that he made. Moreover, at no time did the detectives make promises or pressure the defendant to waive his rights. With respect to the defendant's background, he had prior experience with the criminal justice system, including prior misdemeanor and felony convictions, and had received a tenth grade education. After speaking with the detectives, the defendant agreed to provide a tape-recorded statement. At no time did the defendant request an attorney or indicate that he wanted to do so. The trial court denied the defendant's motion to suppress.[10]

We first set forth the standard of review and applicable principles of law. "The admissibility of a confession is initially a question of fact for the trial court. *State* v. *Madera*, 210 Conn. 22, 40, 554 A.2d 263 (1989); *State* v. *Schroff*, 206 Conn. 182, 195–96, 536 A.2d 952 (1988); *State* v. *Derrico*, 181 Conn. 151, 162–63, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). In view of the constitutional dimension of the issue, the trial court's finding of [whether the defendant's waiver was voluntary and knowing] is, however, subject to an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence. *State* v. *Smith*, 200 Conn. 465, 478, 512 A.2d 189 (1986). We review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quota-

---

[10] The trial court issued an oral decision, in which it stated that "[a]s to the fifth amendment claim, the court finds that the [tape-recorded] statement of the defendant was made after a knowing and voluntary waiver of his *Miranda* rights, and was freely, voluntarily and knowingly made."

tion marks omitted.) *State* v. *Whitaker*, 215 Conn. 739, 742, 578 A.2d 1031 (1990); see also *State* v. *Reynolds*, 264 Conn. 1, 51, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

"To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case." (Internal quotation marks omitted.) *State* v. *Foreman*, 288 Conn. 684, 697, 954 A.2d 135 (2008). Moreover, "[i]n considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 654, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Internal quotation marks omitted.) *State* v. *Foreman*, supra, 288 Conn. 697–98.

We conclude that the trial court properly found that the defendant validly had waived his *Miranda* rights.

In this case, the defendant signed an express written waiver of his rights. "An express written or oral waiver is strong proof of the validity of the waiver." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 52. In addition, the record established that the defendant: (1) was familiar with the criminal justice system; (2) was reasonably intelligent, having achieved a tenth grade education; (3) expressed no uncertainty regarding his rights and appears to have fully understood them; (4) was not under the influence of alcohol or any narcotic substance when he was advised of his rights; and (5) did not suffer from any mental illness or defect that could have adversely affected his ability to comprehend fully his rights. See also *State* v. *Foreman*, supra, 288 Conn. 698–99 (upholding validity of waiver on similar grounds); *State* v. *Reynolds*, supra, 52–53 (same). Consequently, in light of the totality of the circumstances, we conclude that there was substantial evidence to support the court's finding that the defendant knowingly, voluntarily and intelligently waived his *Miranda* rights.

We are not persuaded by the defendant's argument that he cannot have waived his *Miranda* rights knowingly because South Carolina does not afford the right to counsel during extradition proceedings.[11] The defen-

[11] In *State* v. *Pierre*, 277 Conn. 42, 94, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006), we recognized that, in our own jurisprudence, the right to counsel does not attach within the context of extradition proceedings. In that case, we cited *State* v. *Falcon*, 196 Conn. 557, 563–64, 494 A.2d 1190 (1985), in which we "concluded that an extradition hearing does not represent the same type of critical confrontation between an accused and a prosecutor such as found in an arraignment where counsel is constitutionally required. Specifically, we noted: At an arraignment, a defendant is advised of the charges against him and enters a plea. . . . By contrast, at an extradition hearing, a defendant is not asked to plead or to make any other decisions that could affect his right to a fair trial. . . . [M]ost courts in other jurisdictions have held that even proceedings contesting extradition are not a critical stage in the prosecution requiring the presence of counsel." (Internal quotation marks omitted.) *State* v. *Pierre*, supra, 94.

dant predicates his argument on the theory that he reasonably could have believed that if he actually had invoked his right to counsel during the interview with the detectives, he would not have been provided with counsel in light of the South Carolina extradition practice. The defendant then argues that because he did not, in fact, have a right to counsel for purposes of extradition, he cannot have waived his rights knowingly with respect to the custodial interrogation.

This argument is without merit. In essence, the defendant confuses his fifth and sixth amendment rights to counsel.[12] The fact that the defendant's sixth amendment right to counsel had not attached at the time of his extradition proceedings has no bearing on the validity of his waiver of his fifth amendment right to counsel with respect to the custodial interrogation. The flaw in the defendant's argument is that he bases his contention on a mistaken belief that he did not have *any* right to counsel, including a fifth amendment right, while being interrogated on the charge of murder. As the United States Supreme Court made clear in *Miranda* v. *Arizona*, 384 U.S. 436, 469, 86 S. Ct. 1602, 16 L. Ed. 2d 694

---

[12] In *State* v. *Birch*, 219 Conn. 743, 751, 594 A.2d 972 (1991), we quoted the United States Supreme Court in *McNeil* v. *Wisconsin*, 501 U.S. 171, 177–78, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991), regarding the distinction between a defendant's fifth and sixth amendment rights to counsel. "In *McNeil*, the court stated that [t]he purpose of the [s]ixth [a]mendment counsel guarantee—and hence the purpose of invoking it—is to protec[t] the unaided layman at critical confrontations with his expert adversary, the government, after the adverse positions of government and defendant have solidified with respect to a particular alleged crime. . . . The purpose of the [fifth amendment] guarantee, on the other hand—and hence the purpose of invoking it—is to protect a quite different interest: the suspect's desire to deal with the police only through counsel . . . . This is in one respect narrower than the interest protected by the [s]ixth [a]mendment guarantee (because it relates only to custodial interrogation) and in another respect broader (because it relates to interrogation regarding any suspected crime and attaches whether or not the adversarial relationship produced by a pending prosecution has yet arisen)." (Citations omitted; internal quotation marks omitted.) *State* v. *Birch*, supra, 751.

(1966), however, "the right to have counsel present at the interrogation is indispensable to the protection of the [f]ifth [a]mendment privilege under the system we delineate today." See also *State* v. *Vitale*, 190 Conn. 219, 233, 460 A.2d 961 (1983) ("[t]he rights of a defendant against self-incrimination prior to the formal commencement of a judicial criminal proceeding against him are, of course, protected by the *Miranda* warning requirements"). To be sure, if the defendant had invoked his right to counsel, the detectives would have been required to honor it to the extent required by law. Otherwise the purported confession would have violated the defendant's fifth amendment right to counsel. See, e.g., *State* v. *Birch*, 219 Conn. 743, 750, 594 A.2d 972 (1991).

There is no evidence in the record to suggest that the fact that the defendant had no right to counsel for the purpose of extradition confused him with respect to the waiver of his right to counsel during the interrogation by the detectives. The defendant never questioned the detectives as to how he could have a right to counsel during the interrogation even though he did not have a right to counsel with respect to extradition. Indeed, it is clear from the record that the defendant was aware of his right to counsel for purposes of his interview with the detectives, and that he waived that right. Specifically, on the waiver form, the defendant placed his initials next to the box indicating that he understood that he had a right to counsel.[13] In addition, when the detectives asked the defendant whether he had read and understood his *Miranda* rights and whether he had agreed to waive them, he unequivocally replied, "Yes."[14]

---

[13] The box that the defendant checked on the waiver form provides: "I have the right to consult with a lawyer before I answer any questions and I may have a lawyer with me during any questioning."

[14] The relevant portion of the tape-recorded transcript of the defendant's statement to the detectives provides:

"Dadio: Have you been advised of your *Miranda* rights?

"[The Defendant]: Yes, I have.

Because there is substantial and uncontroverted evidence to establish that the defendant knowingly waived his *Miranda* rights, the trial court properly denied his motion to suppress his statement.

## II

The defendant next claims that the trial court's jury charge was improper because it failed to reinstruct the jury that the state bore the burden of disproving the defendant's claim of self-defense beyond a reasonable doubt after the jury sent the court a note asking to be reinstructed on the definition of reasonable doubt. We disagree.

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the

---

"Dadio: Detective Quinn and I did give you a rights waiver form is that correct?

"[The Defendant]: Yes, you all did.

"Dadio: You did read each sentence and initial each sentence after reading?

"[The Defendant]: Yes, I did.

"Dadio: You did sign and date that form on the bottom?

"[The Defendant]: Yes, I did. . . .

"Dadio: Do you understand your *Miranda* rights?

"[The Defendant]: Yes, I do.

"Dadio: Are you willing to waive your *Miranda* rights at this time?

"[The Defendant]: Yes."

instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360–61, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

The record reveals that at the close of trial, the court charged the jury, inter alia, on the elements of the crimes charged, the definition of reasonable doubt and the application of the defendant's claim of self-defense. It is undisputed that the trial court's initial charge properly instructed the jury on the law relating to these concepts. During deliberations, however, the jury sent various questions to the court regarding aspects of the jury charge. In order to frame the issue properly, we detail the relevant questions and the court's responses.

The jury's first relevant question stated: "How or when do you factor in self-defense? If we find guilty of any charge then how do we proceed? (in layman's terms beyond that)." In response, the trial court reissued its initial five page instruction, in which it detailed how the claim of self-defense applied to each of the charges. Prior to reissuing that instruction, the trial court advised the jury that "if there is still confusion, if there [are] still some issues in your mind, send me another note to that effect being as specific as you can as to what [the] particular question is." The trial court then followed its reinstruction on the issue of self-defense with another reminder to the jury that "if there is still confusion in your minds or if you still have questions, come back with another note to me indicating that and I will do my best to perhaps approach it in a different manner." After the court sent the jury back to deliberate, the defendant voiced two concerns regarding the court's reinstruction on self-defense: (1) that it was not clear that the jury understood that the court's references to

"justification" meant the same as "self-defense"; and (2) that the jury was not clear that, at some point, it had to deal with the state's burden to disprove self-defense in its deliberations, specifically that it had to decide whether the state either "failed to disprove self-defense or disproved self-defense beyond a reasonable doubt." As a result of the defendant's concerns, the trial court called the jury back and issued two supplemental charges to address the defendant's concerns.[15]

Some time later that day, the jury sent out an additional note stating: "May we have a definition of reasonable doubt?" After the court indicated to counsel that it intended to reissue its original charge on the definition of reasonable doubt, the defendant requested that the court remind the jury that reasonable doubt applies to both "the elements and the self-defense instruction." The state objected asserting that "I think that's already been covered." Thereafter, the trial court reissued its original charge on the definition of reasonable doubt without reference to its application to either the charged offenses or the claim of self-defense.[16] Defense

[15] The court's supplemental charge provided: "First of all, keep in mind that self-defense equals justification. It's the same thing. When I say justification, I'm referring to self-defense, and when I say self-defense, I'm referring to justification. They are different terms for the same concept.

"Secondly, at some point, wherever you are, you must deal with self-defense. There must be a unanimous decision on self-defense one way or the other. That is, has the state either failed to disprove self-defense or disproved self-defense beyond a reasonable doubt."

[16] The trial court reinstructed the jury on reasonable doubt as follows: "The meaning of reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or a mere conjecture. It is such a doubt as in serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

counsel took exception to the supplemental charge on the ground that it referenced reasonable doubt within the context of guilt only, without explicit reference to its application to the defendant's claim of self-defense.

It is well established that "individual instructions are not to be judged in artificial isolation from the overall charge . . . ." (Internal quotation marks omitted.) *State* v. *Montanez*, 277 Conn. 735, 746, 894 A.2d 928 (2006). We conclude that the charge, when reviewed in its entirety, was proper. The trial court issued thorough and complete instructions at the outset and went to great lengths to address the jury's subsequent inquiries. As the state's brief aptly points out, the trial court expressly instructed the jury on *nineteen* occasions that the state bore the burden of disproving self-defense beyond a reasonable doubt.[17] For example, with respect to the charge on the count of murder, the court instructed the jury that "[t]he burden of proof on a claim of self-defense is on the state. The state must convince you beyond a reasonable doubt that [the defendant] was not justified in his actions under the law of self-defense." Similarly, after describing the ele-

"Proof beyond reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty.

"The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted.

"Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."

[17] We will not attempt to include verbatim references to each of the nineteen occasions. Suffice it to say that those instructions arose during the trial court's initial charge with respect to the count of murder, the lesser included offenses, the court's summary of those offenses, the court's reinstruction on self-defense and the court's reinstruction in response to defense counsel's concerns regarding the previous reinstruction with respect to self-defense.

ments of the claim of self-defense, the trial court instructed the jury that "[t]he state must disprove each of these elements of self-defense beyond a reasonable doubt."

In addition to the trial court's initial instructions regarding the state's burden with respect to the claim of self-defense, the trial court also reiterated that concept in response to the jury's question regarding the point at which it is proper to factor in self-defense. After the trial court reissued its previous summary on the application of self-defense, the trial court stated that "[a]lso, if at any point you find that the state has not disproven justification beyond a reasonable doubt as to a particular charge, you would return a verdict of not guilty as to that charge and any remaining lesser included charges." Later, after the trial court called the jury back to address the two concerns raised by defense counsel, the court reiterated that the state bore the burden of disproving self-defense beyond a reasonable doubt. See footnote 15 of this opinion. The jury did not make any further inquiries regarding the application of self-defense despite the trial court's two admonitions that it should do so if it remained confused. "The jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 544, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

Turning to the jury's request for the definition of reasonable doubt, we conclude that nothing within that question indicates that the jury was confused as to the state's burden with respect to the defendant's claim of self-defense. We reject the defendant's argument that *State* v. *Fletcher*, 10 Conn. App. 697, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988), should persuade us to reach a different conclusion. In that case, the trial court improperly refused to give *any* further

instruction in response to the jury's inquiry on issues related to self-defense and reasonable doubt. Id., 699–700. The Appellate Court reversed the judgment of the trial court because it determined that the trial court erroneously believed that it had discretion to refuse to respond to a jury inquiry if it did not believe that the request was a unanimous product of all twelve jurors. Id., 701, 709.

The present appeal is distinguishable from *Fletcher* for two reasons. First, the trial court in this case *did* respond to the jury's inquiries and issued detailed instructions on the application of self-defense and on the definition of reasonable doubt. Second, the jury in the present case, unlike the jury in *Fletcher*, did not request a rereading of the charges and simultaneously express confusion as to the claim of self-defense. Id., 708. Instead, the jury in this case first asked the court to clarify "[h]ow or when do you factor in self-defense," and the court, in response, issued a clear and concise summary of the application of self-defense to each charge. The jury did not indicate any further confusion as to the application of self-defense, despite the trial court's two invitations to ask follow-up questions if confusion remained on that issue. Later, in a separate and distinct inquiry, the jury asked for the definition of reasonable doubt. The trial court responded with an appropriate instruction that expressly referenced neither the elements of the crimes charged, nor the elements of self-defense. The jury did not issue any further inquiries. See *State* v. *Young*, 29 Conn. App. 754, 761–62, 618 A.2d 65 (1992) ("[a]bsent a request by the jury seeking further instruction on the concept of self-defense or justification, or clear indication evincing confusion on the law relating to that defense, the defendant's constitutional rights are not abridged by the failure to reinstruct on the defense"), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993); see also *State* v. *Kemler*,

106 Conn. App. 359, 364 n.2, 942 A.2d 480 (absent request or confusion, trial court not required to broaden scope of jury's inquiry), cert. denied, 286 Conn. 920, 949 A.2d 482 (2008); *State* v. *Stavrakis*, 88 Conn. App. 371, 388, 869 A.2d 686 (same), cert. denied, 273 Conn. 939, 875 A.2d 45 (2005).

Nothing in the court's instruction on reasonable doubt could have misled the jury as to the state's burden with respect to self-defense, nor could any part of that instruction be interpreted to have abridged or modified the trial court's *nineteen* previous instructions that clearly indicated that the state bore the burden of disproving the defendant's claim of self-defense beyond a reasonable doubt. Given the clarity and repetition of the court's instruction and the complete absence of contradictory or irrelevant language, we cannot conclude that it was reasonably possible that the instruction misled the jury. See *State* v. *Montanez*, supra, 277 Conn. 746 (instruction proper despite multiple references to general intent when only specific intent relevant to charge because instruction regarding specific intent stated with such "repetition, unequivocation and crystalline clarity"); see also *State* v. *Prioleau*, 235 Conn. 274, 322, 664 A.2d 743 (1995) (same).

The judgment is affirmed.

In this opinion the other justices concurred.